# 24-1943-cr

―――――――――――――――――――――

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
―――――――――――――――――――――

UNITED STATES OF AMERICA,

APPELLEE,

-v-

STEVEN GOMEZ,

DEFENDANT,

ADAM GOMEZ,

DEFENDANT-APPELLANT.

―――――――――――――――――

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

―――――――――――――――――――――――――――――――――

**Brief for Defendant-Appellant
Adam Gomez**

―――――――――――――――――――――――――――――――――

James P. Egan
Assistant Federal Public Defender
4 Clinton Square, 3rd Floor
Syracuse, New York 13202
(315) 701-0080

# **Table of Contents**

Table of Authorities................................................................ii

Jurisdictional Statement........................................................1

Statement of the Issue Presented..........................................1

Statement of the Case ............................................................2

Summary of the Argument .....................................................3

Argument ................................................................................4

    18 U.S.C. § 922(k) facially violates the Second Amendment..............4

    I.  Standard of Review ......................................................4

    II. Discussion ....................................................................5

        A.  Adam Gomez's alleged conduct is covered by the text of the Second Amendment. ............................................7

        B.  Section 922(k) is not consistent with this Nation's history and tradition of firearm regulation....................................11

            1.  Section 922(k) does not regulate dangerous and unusual weapons. .......................................12

            2.  Section 922(k) infringes on the right to possess a firearm...................................................16

            3.  The government's historical regulations are not analogous to § 922(k)'s absolute ban. .........................20

Conclusion ...........................................................................26

Certificate of Compliance....................................................27

Certificate of Service ...........................................................28

i

# Table of Authorities

## Cases

*Caetano v. Massachusetts,*
    577 U.S. 411 (2016) .................................................. 13-14

*Class v. United States,*
    583 U.S. 174 (2018) ...................................................... 5

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) ............................................. *passim*

*Friedman v. City of Highland Park, Ill.,*
    577 U.S. 1039 (2015) ................................................... 18

*Heller v. District of Columbia,*
    670 F.3d 1244 (D.C. Cir. 2011) ............................... 13-14

*New York State Rifle & Pistol Association, Inc. v. Bruen,*
    597 U.S. 1 (2022) ................................................ *passim*

*Ocean State Tactical, LLC v. Rhode Island,*
    2022 WL 17721175 (D.R.I. 2022) ................................. 20

*United States v. Gil,*
    2024 WL 2186916 (5th Cir. 2024) ................................. 5

*United States v. Houtar,*
    980 F.3d 268 (2d Cir. 2020) ......................................... 4

*United States v. Kelly,*
    2022 WL 17336578 (M.D. Tenn. Nov. 16, 2022) ......................... 19

*United States v. Miller*,
307 U.S. 174 (1939) ................................................................. 12-14

*United States v. Price*,
111 F.4th 392 (2024) .......................................................... *passim*

*United States v. Rahimi*,
602 U.S. __, 144 S.Ct. 1889 (2024) ...................................... *passim*

*United States v. Scheidt*,
103 F.4th 1281 (7th Cir. 2024) ...................................................... 5

**Statutes**

1 Samuel Johnson,
Dictionary of the English Language 106 (4th ed 1773) ............... 10

1 Timothy Cunningham,
A New and Complete Law Dictionary (1771) ............................. 10

18 U.S.C. § 922(g)(1) .................................................................. 17

18 U.S.C. § 922(k) .............................................................. *passim*

18 U.S.C. § 924(a)(1)(B) .............................................................. 17

Act of Mar. 1, 1809, in 2 The General Laws of Massachusetts, From the
Adoption of the Constitution to February, 1822, at 198 (1823) .. 21

Act of Mar. 8, 1805, in 3 The Laws of the Commonwealth of
Massachusetts, From November 28, 1770 to February 18, 1807
(1807) ........................................................................................ 21

iii

Act of Mar. 10, 1821, in 2 Laws of the State of Maine; to Which Are Prefixed the Constitution of the U. States and of Said State 685 (1821) ..................................................................................... 21

Act of Apr. 18, 1795, in 3 Laws of the Commonwealth of Pennsylvania, From the Fourteenth Day of October, One Thousand Seven Hundred 240 (1810) ...................................................................... 21

Act of June 21, 1820, in The Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 276 (1830) ...................................................................................... 21

Act of Oct. 4, 1776, 1776–1777 N.J. Acts 6............................................... 21

An Act for the Inspection of Gunpowder, Manufactured Within this State, in 8 Records of the State of Rhode Island and Providence Plantations in New England 18 (1863) ......................................... 21

D.C. Code § 7-2501.01 (2001) ................................................................. 13

D.C. Code § 7-2502.02 (2001) ................................................................. 13

Pub. L. No. 90-351, 82 Stat. 197 (1968) .................................................. 22

## Other

Joel Penkala, The Barrel Proofing Process, Shotgun Craftsmanship, Upland Gun Company (March 2, 2021) ........................................ 23

George Harris, What Does It Mean to Proof a Firearm?, NRA Shooting Illustrated.com (Nov. 29, 2020) .................................................... 23

The Proof House, Worshipful Company of Gunmakers......................... 24

NRA Museum, Proof Marks 2403............................................................ 24

## Jurisdictional Statement

This appeal is taken from a judgment of conviction entered against the Defendant-Appellant Adam Gomez in the United States District Court for the Northern District of New York, by the Honorable Frederick J. Scullin, United States District Court Judge, on July 16, 2024. A 121.[1] The district court had subject matter jurisdiction, pursuant to 18 U.S.C. § 3231, because this was a criminal case alleging a violation of 18 U.S.C. § 922(k). A 12. Jurisdiction is invoked in this Court pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. A notice of appeal was timely filed on July 17, 2024. A 128.

## Statement of the Issue Presented

Whether 18 U.S.C. § 922(k) is facially unconstitutional under the Second Amendment.

---

[1] Citations to the Appendix (A) are to the page numbers inserted therein.

## Statement of the Case

On March 16, 2023, Adam Gomez was indicted by a federal grand jury with one count of possessing a firearm (a Glock 17 handgun) with a removed, obliterated, or altered serial number, in violation of 18 U.S.C. § 922(k).[2]  A 12.

Relying on recent Second Amendment jurisprudence, Gomez moved to dismiss the indictment, arguing that § 922(k) is unconstitutional on its face.

The district court denied the motion, concluding that the Second Amendment does not protect the conduct criminalized by § 922(k) and that § 922(k) is consistent with the Nation's historical tradition of firearm regulations.  A 67.

Gomez pled guilty without an agreement on March 20, 2024.  A 92.

---

[2] As relevant here, 18 U.S.C. § 922(k) makes it a crime for any person "to possess or receive any firearm which has had the importer's or manufacturer's serial number removed, obliterated, or altered and has, at any time, been shipped or transported in interstate or foreign commerce."

2

On July 10, 2024, the district court sentenced Gomez to eleven months in prison to be followed by three years of supervised release. A 121.

## Summary of the Argument

This Court should vacate Adam Gomez's conviction because 18 U.S.C. § 922(k) is facially unconstitutional under the Second Amendment.[3] Section 922(k) proscribes conduct that is presumptively covered by the Second Amendment. Gomez is a member of "the people" and Section 922(k) seeks to criminalize his possession of a firearm for self-defense. The government cannot meet its burden of demonstrating that Section 922(k) is consistent with the Nation's "historical tradition of firearm regulation." This is because there is no tradition of criminally prosecuting and permanently disarming any member of "the people" based on a regulation of a firearm's non-functional and non-product-quality features.

---

[3] This appears to be an issue of first impression in this Court.

3

## Argument

**18 U.S.C. § 922(k) facially violates the Second Amendment.**

## I.    Standard of Review

This Court reviews preserved constitutional challenges to statutes *de novo*. *See United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020) (citations omitted).

Gomez preserved his challenge to the constitutionality of 18 U.S.C. § 922(k) by raising it in the district court. The Supreme Court held in *Class v. United States*, 583 U.S. 174 (2018), that a guilty plea does not, by itself, waive a defendant's constitutional challenge to the statute of conviction. Like Gomez, Class sought to dismiss an indictment on Second Amendment grounds. He pled guilty pursuant to a plea agreement that neither expressly preserved nor expressly waived his right to appeal the denial of his motion to dismiss the indictment because the statute violated the Second Amendment. The Supreme Court held that a guilty plea, by itself, does not bar a "criminal defendant from later appealing

4

his conviction on the ground that the statute of conviction violates the Constitution."

Since *Class*, other circuit courts have held that a defendant does not need to enter into a conditional plea agreement to preserve a Second Amendment challenge presented in the district court. *See, e.g., United States v. Gil*, 2024 WL 2186916, at *2 (5th Cir. 2024) ("Gil preserved his right to challenge the constitutionality of the statute of conviction on direct appeal by raising the challenge in the district court in his motion to dismiss the indictment."); *United States v. Scheidt*, 103 F.4th 1281 (7th Cir. 2024) ("Scheidt may pursue a constitutional challenge to § 922(a)(6) even though she pleaded guilty without reserving the right to appeal.").

## II. Discussion

The Second Amendment guarantees a pre-existing right to keep and bear arms for self-defense:

> A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed.

5

U.S. Const. Amend II; *District of Columbia v. Heller*, 554 U.S. 570 (2008). "Like most rights," however, "the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626. The scope of the right is defined by "constitutional text and history." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 22 (2022). Accordingly, Congress is only free to act when a given regulation fits within the "historical tradition of firearm regulation." *Id.* at 17. However, when "the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *United States v. Rahimi*, 602 U.S. __, 144 S.Ct. 1889, 1897 (2024) (quoting *Bruen*, 597 U.S. at 24).

The result is a two-step analysis:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

*Bruen*, 597 U.S. at 17.

6

A regulation is "consistent with the Nation's historical tradition of firearm regulation" only when the new law is "relevantly similar" to laws that the nation's regulatory tradition is understood to permit. *Rahimi*, 144 S.Ct. at 1898. This inquiry focuses on the "why and how" of a given regulation:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding. And when a challenged regulation does not precisely match its historical precursors, "it still may be analogous enough to pass constitutional muster."

*Id.* at 1898 (citations omitted). Ultimately, the law must comport with the principles underlying the Second Amendment, but it need not be a "dead ringer" or "historical twin." *Id.*

## A. Adam Gomez's alleged conduct is covered by the text of the Second Amendment.

The text of the Second Amendment's operative clause contains three elements, guaranteeing the right (1) "of the people," (2) "to keep

7

and bear," (3) "arms." *Heller*, 554 U.S. at 579-95 (2008). Accordingly *Bruen*'s first step contains three discrete questions: "(1) does § 922(k) apply to 'the people'?; (2) is a firearm with an obliterated serial number an 'Arm'?; and (3) is possession of such a firearm an act of 'keep[ing]' or 'bear[ing]' arms?" *United States v. Price*, 111 F.4th 392, 427 (2024) (Richardson, J., dissenting). "The answer to each inquiry is yes, so § 922(k) is presumptively invalid under the Second Amendment." *Id.*

Notwithstanding this straightforward textual analysis, the district court held that Gomez's challenge failed at *Bruen*'s first step:

> [T]he conduct that § 922(k) regulates – possession of a gun without a serial number – is outside the scope of the Second Amendment. There is nothing in the Court's decision in *Bruen* that changes the Court's earlier discussion in *Heller* that there is nothing in the Second Amendment that requires that citizens should be able to possess and carry any gun – even the most popular gun – without restrictions. Moreover, the Court finds that the restriction that § 922(k) places upon the possession of guns – that they must have a serial number – does not burden a citizen's right to possess a gun for self-defense. Therefore, the Court concludes that § 922(k) does not violate a law-abiding citizen's Second Amendment right to possess a firearm for self-defense; it merely regulates a non-functional requirement of any such firearm – that it possess a serial number.

8

A 79.

The district court's conclusion should be rejected for several reasons.  First, for purposes of the Second Amendment analysis, the conduct regulated by Section 922(k) is the keeping of arms.  It is not, as the district court would have it, the keeping of an arm with a specific characteristic.  Were the analysis so particularized, nearly every regulation would fall outside the Second Amendment.  After all, *Bruen* was about licenses.  If the constitutional question were cast as narrowly as the district court would have it, the conduct in that case – carrying a firearm without a license – would be unprotected.

Second, the district court's conclusion rests on the assumption that a firearm with a removed serial number is not an "Arm" for purposes of the Second Amendment.  The Supreme Court has already held otherwise, stating that the term "extends, prima facie, to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." *Heller*, 554 U.S. at 582.  Firearms with removed, obliterated, or altered serial numbers have not been

9

transformed into something else; they are still "Arms." *See id*. at 581 (defining an "Arm" as a "weapon[] of offense" that can be worn for "defence . . . or use[d] in wrath to cast at or strike another") (first quoting 1 Samuel Johnson, Dictionary of the English Language 106 (4th ed 1773); and then quoting 1 Timothy Cunningham, A New and Complete Law Dictionary (1771)).

Third, the fact that the Second Amendment may not protect keeping and bearing "any weapon in every way possible" is irrelevant at step one of the *Bruen* analysis. Any limitation on "dangerous and unusual weapons" derives from "the historical understanding of the Amendment to demark the limits on the exercise of that right." *Bruen*, 142 S.Ct. at 2111. "So while dangerous and unusual weapons are not within the scope of the Second Amendment, it is because history and tradition show that the government can permissibly ban them," under step two of *Bruen*, "not because they fall outside the Amendment's plain text," under step one. *Price*, 111 F.4th at 428 (Richardson, J., dissenting). The Supreme Court's decision in *Rahimi* confirmed this

10

clear distinction between *Bruen*'s steps by repeating that "when the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" *Rahimi*, 144 S.Ct. at 1897 (quoting *Bruen*, 142 S.Ct. at 2111). "And notably, the Court didn't limit 'arms-bearing conduct' to 'conduct that historically fell within the traditional scope of the right to keep and bear arms.' Instead, historical limitations on the scope of the right are relevant to establish whether the government is permitted to regulate the 'arms-bearing conduct' in the manner it does – the step-two inquiry." *Price*, 111 F.4th at 429 (Richardson, J., dissenting).

Finally, the district court did not even find that firearms with removed, obliterated, or altered serial numbers are actually dangerous and unusual. So, the Second Amendment presumptively protects the conduct regulated by Section 922(k) even under the district court's overly narrow interpretation of step one.

## B. Section 922(k) is not consistent with this Nation's history and tradition of firearm regulation.

Because the text of the Second Amendment protects Gomez's right

11

to possess a firearm (properly serialized or not), the analysis moves to step two, which requires the government to " justify [Section 922(k)] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2129-30.

The government attempted to satisfy its burden in three ways. First, the government contended (though in step one) that firearms with removed, obliterated, or altered serial numbers are dangerous and unusual. Second, the government claimed (again in step one) that § 922(k) does not burden the Second Amendment right. Third, the government argued that § 922(k) was analogous to a few early inspection and marking regulations. None satisfies the government's burden.

### 1. Section 922(k) does not regulate dangerous and unusual weapons.[4]

---

[4] As noted above, whether a firearm can be regulated as dangerous and unusual derives not from the Second Amendment's text, but from historical tradition and is, therefore, a step-two question. *Heller* said as much when explaining that the Second Amendment's protection of weapons typically possessed by law-abiding citizens for lawful purposes "accords with the historical understanding of the scope of the right" and is "fairly supported by the historical tradition of prohibiting the carrying of 'dangerous and unusual weapons.'" *Heller*, 554 U.S. at 625, 627 (citing *United States v. Miller*, 307 U.S. 174 (1939)). *Bruen* further clarified that the Court uses "history to determine which modern 'arms' are protected by the Second Amendment." *Bruen*, 597 U.S. at 28.

12

The tradition of regulating dangerous and uunsual firearms is grounded solely in functional characteristics.  It does not extend to non-functional ones.  Judge Richardson recently highlighted the Supreme Court's adherence to this regulatory distinction:

> Each time the Supreme Court has discussed or applied this tradition, it has considered whether the banned weapons as a "class" or "type" are dangerous and unusual. *See Miller*, 307 U.S. at 179 ("kind" of weapon); *Heller*, 554 U.S. at 628 ("class of arms"); id. at 622–23 ("type of weapon"); *Caetano v. Massachusetts*, 577 U.S. 411, 419 (2016) (Alito, J., concurring) ("the Second Amendment . . . protects such weapons as a class"); *Bruen*, 597 U.S. at 47 ("class of firearms").  And in each case, the class of weapons in question was defined by physical characteristics that impacted the gun's functioning. *See Miller*, 307 U.S. at 175 (analyzing the National Firearms Act's ban on possession of "shotgun[s] having a barrel or barrels of less than 18 inches in length"); *Heller*, 554 U.S. at 574 (analyzing D.C. Code §§ 7-2501.01(12), 7-2502.01(a), 7-2502.02(a)(4) (2001), which banned the possession of "pistols," defined as "any firearm originally designed to be fired by use of a single hand or with a barrel less than 12 inches in length"); *Bruen*, 597 U.S. at 1 (analyzing a New York statute that required a license to carry any "pistol or revolver"); *Caetano*, 577 U.S. at 414 n.1 (Alito, J., concurring) (analyzing a Massachusetts statute that banned any "portable device or weapon from which an electrical current, impulse, wave or beam may be directed, which current, impulse, wave or beam is designed to incapacitate temporarily, injure or kill"); *see also Heller v. District of Columbia*, 670 F.3d 1244, 1286 n.10 (D.C. Cir. 2011) (*Heller II*) (Kavanaugh, J., dissenting)

13

(analyzing a District of Columbia statute that "bans semi-automatic rifles by listing specific guns that . . . share the characteristics of being a long gun and firing in a semi-automatic manner, and typically have features such as protruding pistol grips"). The Court then asked whether the class of weapons—i.e., weapons with the defined functional characteristics—was dangerous and unusual. See *Miller*, 307 U.S. at 178, 59 S.Ct. 816; *Heller*, 554 U.S. at 628–29, 128 S.Ct. 2783; *Bruen*, 597 U.S. at 47; *Caetano*, 577 U.S. at 420, (Alito, J. concurring); *see also Heller II*, 670 F.3d at 1286–87 (Kavanaugh, J., dissenting). Thus, the Court has always assessed whether the banned weapons were dangerous and unusual on a class-wide level, and the Court has always considered classes that were defined by shared functional characteristics.

*Price*, 11 F.4th at 430-431.

Section 922(k) has nothing to do with functionality. "Serial numbers are ubiquitous and appear on modern firearms of all shapes and sizes." *Id*. at 432. The presence of a serial number has no effect on any firearm's functionality. Therefore, Section 922(k) does not fit within the history of regulating dangerous and unusual arms.

In any case, the government utterly failed to meet is burden of demonstrating (and the district court never held) that firearms with removed, obliterated, or altered serial numbers are actually dangerous

14

*and* unusual. In the absence of any historical examples or statistical information, the government merely asserted below that "the only reason to obliterate a serial number is to avoid being connected with a firearm that was stolen, involved in a crime, or obtained in a straw purchase." A 34. But an individual does not have to personally remove, obliterate, or alter a firearm's serial number to be criminally culpable under § 922(k); mere possession of the gun is enough. And it is simply not true, as the government maintained, that firearms with a removed, obliterated, or altered serial numbers are never possessed by law abiding citizens for lawful purposes, that they are not "necessary" to protect the right to self-defense, or that the only reason to possess an such a firearm is to evade law enforcement detection. A 34. In any event, a private citizen might possess a firearm with a removed, obliterated, or altered serial number because they received it as a gift, because they legally bought it from a non-licensed dealer, because the serial number wore away, or for any other number of innocuous reasons Gomez has no burden to demonstrate.

15

Possessing a firearm with a removed, obliterated, or altered serial number is not inherently unlawful or inherently nefarious and is a perfectly legitimate exercise of the fundamental right to keep and bear arms. Indeed, as the government conceded, Section 922(k) recognizes the innocence of such conduct by permitting the possession of such a firearm manufactured before 1968, as well as one privately made today. A 36.

### 2. Section 922(k) infringes on the right to possess a firearm.[5]

The government claimed (and the district court held) below that Section 922(k) does not meaningfully burden Second Amendment conduct because serialization does not affect a firearm's functionality, marked firearms are ubiquitous, and individual self-defense may still be exercised using serialized, pre-1968 unserialized firearms, or even

---

[5] Like the government's reliance on the class of dangerous and unusual weapons, its infringement argument also falls within step two. "[A]s *Rahimi* shows, *Bruen*'s first step does not inquire into the magnitude of injury inflicted by a firearm regulation. Rather, the question is simply whether a law regulates arms-bearing conduct, which § 922(k) does." *Richardson*, 111 F.4th at 429 n.4.

16

privately made firearms that lack serial numbers.  A. 34-36, 79.  This is incorrect.

Section 922(k) expressly prohibits possession of a firearm.  Every individual possessing a post-1968 firearm with a removed, obliterated, or altered serial number is subject to a federal felony criminal prosecution under Section 922(k) unless they forfeit their constitutional right to self-defense.  Otherwise, a conviction exposes a person to five years in prison and permanent disarmament.  *See* 18 U.S.C. §§ 922(g)(1), 924(a)(1)(B).  So, the burden of Section 922(k) on possessing an improperly serialized firearm is both heavy and real.  This is disproportionate and unreasonable when serialization does not impact firearm functionality, safety, or dangerousness, and § 922(k)'s burden can supposedly be alleviated by just possessing either a properly serialized or a pre-1968 unserialized firearm, assuming a given citizen is even capable of discerning the difference.

More importantly, the government cannot infringe upon a constitutional right in one way just because it does not violate it in other

17

ways. The government below frequently remarked on how an improperly serialized firearm is not "necessary" to protect the right to self-defense. A 34-36. Technically, no specific type of firearm is "necessary" to protect the right to self-defense as long as there is still available at least one other type of firearm. But this is not how the Second Amendment is applied post *Heller* and *Bruen*. *Heller* made this point discussing the District of Columbia's ban on handguns in the home: "It is no answer to say, as petitioners do, that it is permissible to ban the possession of handguns so long as the possession of other firearms (i.e., long guns) is allowed." *Heller*, 554 U.S. at 629.

The question under *Heller* is not whether citizens have adequate alternatives available for self-defense. Rather, *Heller* asks whether the law bans types of firearms commonly used for a lawful purpose regardless of whether alternatives exist. *See Friedman v. City of Highland Park, Ill.*, 577 U.S. 1039, 136 S. Ct. 447, 448 (2015) (Thomas, J. dissenting from denial of certiorari). "The government points out that a bar on receiving a new firearm is not a total ban on weapons possession, but neither was

18

the law found to be unconstitutional in *Bruen*. Generally speaking, moreover, the infringement on a constitutional right in one way is not typically negated by the fact that the government did not violate the same right even further in another way." *United States v. Kelly*, No. 3:22-CR-00037, 2022 WL 17336578, at 3 (M.D. Tenn. Nov. 16, 2022). Deciding whether a law violates the Second Amendment based on how great a burden it imposes does *exactly* what *Bruen* prohibited in the context of the "relevantly similar" analysis – returning to independent means-ends balancing under the guise of analogical reasoning. *Bruen*, 597 U.S. at 29 n.7.

Following *Bruen*, courts do not ask about the size of the burden placed on protected conduct. Any burden is impermissible, unless the government conclusively proves it is consistent with a robust historical tradition of firearm regulation. As one court observed, "*Bruen* does not allow the Court to balance the extent of an intrusion into a Second Amendment right against the strength of the public interest served by" the challenged regulation "or the closeness of the means to the statute

19

and the end." *Ocean State Tactical, LLC v. Rhode Island*, 2022 WL 17721175, at 14, n.28 (D.R.I. 2022). That is because a court "cannot . . . conclude that the impairment is 'modest' and 'the fit between [legislative] interests and restrictions imposed by the Act is both close and reasonable.'" Rather, "any intrusion into a right protected by the Second Amendment thrusts us into the territory of justifying the regulation as one historically placed on similar weapons." *Id.* (emphasis added)).

### 3. The government's historical regulations are not analogous to § 922(k)'s absolute ban.

The Government below pointed to (and the district court credited) a handful of commercial gunpowder and gun barrel statutes as being "relevantly similar" historical analogues to Section 922(k). Although not fully cited by the government below, the regulatory record, generally categorized, reveals:

> Five states required gunpowder to be inspected and marked for quality and prohibited the sale of unmarked powder.[6] One

---

[6] Act of Oct. 4, 1776, ch. VI, §§ 1, 3, 1776–1777 N.J. Acts 6, 6–7; An Act for the Inspection of Gunpowder, Manufactured Within this State, in 8 Records of the State of Rhode Island and Providence Plantations in New England 18, 18–19 (1863); Act of Apr. 18, 1795, ch. MDCCCXLVI, § 107, in 3 Laws of the Commonwealth of Pennsylvania, From the Fourteenth Day of October, One Thousand Seven Hundred

state went a step further and prohibited anyone from 'fraudulently alter[ing] or defac[ing] any mark' placed by an inspector.[7] Similarly, two states in the early nineteenth century required inspectors to proof and mark firearm barrels and prohibited the sale of unmarked weapons.[8] Both also prohibited anyone from altering the marks once in place.[9]

*Price*, 111 F.4th at 435-436 (Richardson, J., dissenting) (citations footnoted below). This scant historical evidence is insufficient.

Rather than requiring marking and serialization procedures to aid in solving crimes or keeping gunpowder away from "dangerous people" – the stated purpose of § 922(k)[10] – the cited gunpowder laws regulated

---

240, 243 (1810); Act of Mar. 1, 1809, ch. 52, §§ 3, 6, in 2 The General Laws of Massachusetts, From the Adoption of the Constitution to February, 1822, at 198, 199 (1823); Act of June 21, 1820, ch. II, §§ 3–6, in The Laws of the State of New Hampshire; with the Constitutions of the United States and of the State Prefixed 276, 277–78 (1830).

[7] Act of Mar. 1, 1809, supra n.5, § 6, at 199–200.

[8] Act of Mar. 8, 1805, §§ 1, 3, in 3 The Laws of the Commonwealth of Massachusetts, From November 28, 1770 to February 18, 1807, at 259, 259–60 (1807); Act of Mar. 10, 1821, ch. CLXII, §§ 1, 3, in 2 Laws of the State of Maine; to Which Are Prefixed the Constitution of the U. States and of Said State 685, 685 (1821).

[9] Act of Mar. 8, 1805, supra, § 4, at 261; Act of Mar. 10, 1821, supra, § 4, at 686.

[10] *See* Omnibus Crime Control and Safe Streets Act of 1968, Pub. L. No. 90-351, 82 Stat. 197, 197 ("To assist State and local governments in reducing the incidence of crime, to increase the effectiveness, fairness, and coordination of law enforcement and criminal justice systems at all levels of government, and for other purposes.").

21

commerce as a matter of consumer and product safety. *See Price*, 111 F.4th at 436 (Richardson, J., dissenting) ("[T]he historic gunpowder-and-firearm-marking laws were enacted for product-quality purposes: They ensured that weapons were effective and did not jeopardize public safety when deployed."). Moreover, the penalties for violating any of these statutes did not result in firearm disarmament or imprisonment, and instead typically resulted in a nominal forfeiture of non-conforming gunpowder and in the imposition of various fines. A 39-41. Therefore, these laws were not "comparably justified" relative to § 922(k), which is meant to reduce the use of firearms for unlawful purposes and aid in solving crimes. *Price*, 111 F.4th at 436 (Richardson, J., dissenting) (citing *Bruen*, at 597 U.S. at 29).

The government maintained that two "barrel proofing statutes" enacted by Maine and Massachusetts over fourteen years after the Founding – between March 8, 1805, and March 10, 1821 – demonstrate a historical tradition of firearm regulation which would support the constitutionality of Section 922(k). A 41-43. To understand why the

22

referenced barrel proofing laws plainly do not do so, it is important to understand what barrel proofing does and what it is for.

"Barrel proofing" was a type of musket and pistol barrel-function testing where appropriate sized ammunition was overloaded with powder in the gun on purpose. *See* Joel Penkala, *The Barrel Proofing Process, Shotgun Craftsmanship*, Upland Gun Company (March 2, 2021), https://uplandguncompany.com/the-barrel-proofing-process/ (last viewed Feb. 2 2023); George Harris, *What Does It Mean to Proof a Firearm?*, NRA Shooting Illustrated.com (Nov. 29, 2020), https://www.shootingillustrated.com/content/what-does-it-mean-to-proof-a-firearm/ (last viewed Nov. 6, 2024). Discharging the gun with the overloaded powder produced higher than normal pressures inside the barrel. If the barrel as constructed could withstand the increased pressures from the overloaded discharge, it was expected to withstand the significantly lower pressures of non-overloaded discharges that occurred with regular use. Proofing barrels either worked or failed. For those that worked and passed the "proofing" process, the barrels were

23

affixed with a stamp as notice to anyone using the gun about the identity of who proofed the barrel and that it had been safely proofed to work as intended. Barrel proofing started being used by English gunsmiths during the 1630s. *See*, *e.g.*, *The Proof House*, Worshipful Company of Gunmakers, https://www.gunmakers.org.uk/the-proof-house/ (last viewed Nov. 6, 2024). The United States historically had no formal proofing houses (like European countries), so most American manufacturers today voluntarily proof their own firearms. See NRA Museum, Proof Marks 2403, https://www.nramuseum.org/media/940944/proofmarks.pdf (last viewed Nov. 6, 2024).

Barrel proofing and barrel proofing marks, in other words, were also consumer product safety measures, expressly adopted to protect firearm end-users and to improve firearm safety. The manufacturer name stamp on a modern firearm is the modern analog of the proofing stamps on firearms in the Founding era. Barrel proofing statutes,

24

therefore, are not "relevantly similar" to Section 922(k)'s prohibition against possessing an improperly serialized firearm.

Finally, the government made general reference to largely seventeenth-century colonial commercial statutes regulating "the firearms trade" by location and jurisdiction, and six colonies' prohibition on the sale of firearms to Native Americans. *See* A 39, 42. The government contended "these laws show that colonial legislatures were concerned about the movement of firearms between private parties and the dangers of firearms falling into the wrong hands." A 39. The cited text and statutes do not necessarily support the government's general assertion, and it defines the stated purpose much too broadly. Moreover, the government "offers no evidence that these laws burdened the ability of any member of the political community to keep or bear arms. So even if § 922(k) only imposes a minimal burden, these laws still are not analogous because they imposed no burden at all." *Price*, 111 F.4th at 437-438 (Richardson, J., dissenting).

25

## Conclusion

Based on the foregoing reasons, this Court should vacate the judgment and remand with instructions to dismiss the indictment.

November 7, 2024                    Respectfully submitted,

                                   */s/*
                                   James P. Egan
                                   Assistant Federal Public Defender
                                   4 Clinton Square, 3rd Floor
                                   Syracuse, New York 13202
                                   (315) 701-0080

26

## Certificate of Compliance

Pursuant to Rule 32(g) of the Federal Rules of Appellate Procedure, counsel certifies that this brief complies with the type-volume limitations of Rule 32(a)(7), and contains 4,785 words, as counted by the word-processing system to prepare this document.


*/s/*
James P. Egan
Assistant Federal Public Defender

27

## Certificate of Service

I, Renata Hohl, certify that today, November 7, 2024, one copy of the Appellant's Brief, was served upon Carla B. Freedman, United States Attorney, through Rajit S. Dosanjh, AUSA, 100 South Clinton Street, Syracuse, New York 13261, by ECF with hand delivery to follow.

*/s/*
Renata Hohl